

CLERK, U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

# ENTERED

THE DATE OF ENTRY IS ON
THE COURT'S DOCKET

**The following constitutes the ruling of the court and has the force and effect therein described.**

**Signed April 1, 2026**

_____
**United States Bankruptcy Judge**
_____

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | | |
|---|---|---|
| In re: | § | |
| | § | Case No. 22-42372-ELM |
| MICHAEL EDWARD BROWN, | § | |
| | § | Chapter 7 |
| Debtor. | § | |
| | § | |
| PEOPLELINK, LLC d/b/a TRADE MANAGEMENT, | § | |
| | § | |
| | § | |
| Plaintiff, | § | |
| v. | § | Adversary No. 23-04016 |
| | § | |
| MICHAEL EDWARD BROWN, | § | |
| | § | |
| Defendant. | § | |

## MEMORANDUM OPINION

In this adversary proceeding, Plaintiff Peoplelink, LLC d/b/a Trade Management ("**Peoplelink**") has filed suit against Defendant Michael Edward Brown ("**Brown**"), the chapter 7 debtor in Case No. 22-42372 (the "**Bankruptcy Case**"), to seek both the denial of Brown's bankruptcy discharge pursuant to 11 U.S.C. § 727(a)(2) and a determination of the

nondischargeability of the debt owed by Brown to Peoplelink pursuant to 11 U.S.C. § 523(a)(2)(A).[1]

Pursuant to its Complaint,[2] Peoplelink first asserts that Brown should be denied a bankruptcy discharge because of his alleged fraudulent transfer of proceeds from the sale of his home with the intent to hinder his creditors.  Next, Peoplelink asserts that the debt owed by Brown to it for labor supplied to Brown's business should be determined to be nondischargeable because the debt allegedly arose out of false representations and actual fraud.  Brown opposes both aspects of the requested relief in his Answer.[3]

The Court conducted a trial on June 17, 2025, at the conclusion of which the Court took the matter under advisement.  Having considered the Complaint, the Answer, the parties' respective pretrial submissions,[4] the evidence introduced at trial, the representations and arguments of counsel, and the parties' post-trial briefs,[5] the Court now issues its findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure 52, as made applicable to this proceeding pursuant to Federal Rule of Bankruptcy Procedure 7052.[6]

### *JURISDICTION*

The Court has jurisdiction of this adversary proceeding pursuant to 28 U.S.C. §§ 1334 and 157 and *Miscellaneous Order No. 33: Order of Reference of Bankruptcy Cases and Proceedings*

---

[1] Peoplelink also asserted claims pursuant to 11 U.S.C. §§ 727(a)(3) and 523(a)(4).  These claims, however, have since been abandoned by Peoplelink and, therefore, will not be discussed further herein.  *See, e.g.*, Docket Nos. 99, 101 and 112 (Peoplelink's proposed pretrial order, pretrial brief, and post-trial brief, none of which reference claims under Bankruptcy Code § 727(a)(3) or § 523(a)(4)).

[2] *See* Docket No. 61 (Peoplelink's *First Amended Complaint*, simply referred to herein as the "**Complaint**").

[3] *See* Docket No. 104 (*Defendant's Answer*, simply referred to herein as the "**Answer**").

[4] *See* Docket Nos. 99, 100 and 101.

[5] *See* Docket Nos. 111 and 112.

[6] To the extent any of the following findings of fact are more appropriately categorized as conclusions of law or include any conclusions of law, they should be deemed as such, and to the extent that any of the following conclusions of law are more appropriately categorized as findings of fact or include any findings of fact, they should be deemed as such.

*Nunc Pro Tunc* (N.D. Tex. Aug. 3, 1984).  Venue of the proceeding in the Northern District of Texas is proper pursuant to 28 U.S.C. § 1409.  The proceeding is core in nature pursuant to 28 U.S.C. § 157(b)(2)(I) and (J).

## *FACTUAL BACKGROUND*

### A.     *Peoplelink's Customer Services Agreement with Zomac*

Peoplelink, a company registered to conduct business in Texas, is a provider of workforce staffing solutions.  In general terms, Peoplelink fills the temporary labor needs of its customers at "bill-rates" agreed upon in accordance with the terms and conditions of the services agreements that it enters into with its customers.

Under Peoplelink's business model, the individuals deployed by Peoplelink to its customers are actually employed by Peoplelink.  As such, Peoplelink is responsible for the payment of all wages, applicable benefits, and withholding taxes for such individuals.  Peoplelink then effectively recoups those expenses out of the bill-rates that it collects from its customers.  Because Peoplelink's ability to keep up with its own payroll obligations is dependent upon the timely payment of customer invoices, each new customer is required to undergo and pass a credit check before Peoplelink will enter into a services agreement with it.  In some instances, Peoplelink's willingness to enter into an agreement with a new business entity customer is dependent upon the entity's provision of an owner guaranty.

Among the labor needs that Peoplelink regularly filled during the relevant time frame were construction workers to construction projects throughout Texas.[7]  One of Peoplelink's customers was Zomac Electrical Systems, Inc. d/b/a Zomac Electrical Systems or sometimes just Zomac Electric ("**Zomac**"), an electrical subcontractor.  On or about November 4, 2019, Peoplelink and

---

[7] *See* Complaint ¶ 12; Answer ¶ 12.

Zomac entered into a Client Services Agreement (the "**Zomac CSA**").[8]  Pursuant to the Zomac CSA, Peoplelink agreed to recruit, interview and assign employees to work for Zomac on a temporary basis, if, as, and when requested in writing by Zomac, and to pay the wages, applicable benefits, and withholding taxes of each assigned employee.[9]  Zomac agreed to pay to Peoplelink the product of (a) the bill-rate assigned to each such employee, being the rate separately confirmed in writing between the parties, multiplied by (b) the number of hours worked by the employee, which the employee and Zomac would be responsible for reporting to Peoplelink.[10]  The Zomac CSA provided for a one-year term, with automatic one-year renewals thereafter; however, the agreement was also terminable at will by either party upon thirty (30) days written notice.[11]  Tommy Gutierrez, one of Zomac's owners,[12] executed the Zomac CSA on behalf of Zomac.[13]  Peoplelink designated Chris Farrell ("**Farrell**") to serve as the Zomac account manager.[14]

Logistically, the parties agreed that Peoplelink would provide weekly invoices to Zomac, and Zomac would then be required to pay the invoices in full in accordance with their terms, along with interest if unpaid for more than sixty days.[15]  As additional security, Peoplelink required and obtained a guarantee from one or both of Zomac's owners.  At the time of execution of the Zomac CSA, Zomac was headquartered at 101 S. Sylvania Avenue, Fort Worth, Texas 76111 (the "**Sylvania Property**").[16]

---

[8] *See* Plaintiff's Exh. 1 (Zomac CSA); *see also* Complaint ¶ 13; Answer ¶ 13.

[9] *See* Zomac CSA ¶ 3.a.-c.

[10] *See id.* ¶ 7.a.

[11] *See id.* ¶ 2.

[12] *See* Plaintiff's Exh. 3, at p.1 (Recital D – identifying the owners of Zomac as Tommy and Glenda Gutierrez).

[13] *See* Zomac CSA, at p.5.

[14] *See id.*, at p.1.

[15] *See id.* ¶ 7.f.-g.

[16] *See* Complaint ¶ 15; Answer ¶ 15.

**B.      *Brown's Background and Plan to Acquire Zomac***

Brown, a resident of Texas, received a degree in construction management from Oklahoma State University in 1993.[17]  Throughout his career, Brown worked in the construction industry, having, among other things, gained experience in remodeling projects and served as both a commercial and residential general contractor.

Brown is married to Stephanie Brown.  In January 2003, the Browns purchased a house located at 12504 Ark Road, Frisco, Texas 75035 (the "**Frisco Property**").[18]  They designated the Frisco Property as their homestead and lived there through the date of sale in July 2022, as detailed below.[19]

In late 2018, Brown set his sights on acquiring the business of Zomac.  On November 29, 2018, he organized Full Boar Ventures, LLC ("**Full Boar**") as the vehicle through which he would pursue the acquisition.[20]  Brown identified Full Boar as a member-managed Texas limited liability company and designated himself as the sole manager of Full Boar on Full Boar's Certificate of Formation.  Additionally, he proactively listed the Sylvania Property address as both his business address (as the manager of Full Boar) and the business address for Full Boar's registered agent.[21]

Early on, Full Boar was set up to be jointly owned by Brown and Gary Adams ("**Adams**"). Pursuant to Full Boar's amended Limited Liability Company Operating Agreement, dated as of June 25, 2019 (the "**Full Boar LLC Agreement**"), which was executed by both Brown and Adams,

---

[17] *See* Complaint, ¶ 8; Answer, ¶ 8.

[18] *See* Bankruptcy Case Docket No. 1, at ECF p.62 (response to Question 2 of the Brown's *Statement of Financial Affairs* (the "**SOFA**")).

[19] *See* Complaint ¶ 49; Answer ¶ 49.

[20] *See* Plaintiff's Exh. 2, at pp.BROWN-MEB-000023 to -000026 (Full Boar's Certificate of Formation); Plaintiff's Exh. 21 (the "**Brown Deposition**"), at pp.28:21-23, 31:10-17; Complaint ¶ 9; Answer ¶ 9.

[21] *See* Plaintiff's Exh. 2, at p.BROWN-MEB-000023 (Full Boar's Certificate of Formation).

Brown was identified as the 90% Class A Member and Adams was identified as the 10% Class B Member.[22]  Brown, who had capitalized Full Boar with an initial $150,000 borrowed from his parents, was listed as the only member who had made a capital contribution to the company.[23] Pursuant to the Full Boar LLC Agreement, Brown was also identified as Full Boar's President.[24]

## C.  *Full Boar Acquires Substantially All of Zomac's Assets*

Brown's plan to acquire the business of Zomac finally came together in November 2019, shortly after Zomac had entered into the Zomac CSA with Peoplelink.  By that time, Brown had acquired Adams' membership interest in Full Boar and was the sole member of the company.[25]

On November 19, 2019, Zomac and Full Boar entered into an Asset Purchase Agreement, dated November 19, 2019 (the "**APA**"),[26] pursuant to which (a) Zomac agreed to sell, and Full Boar agreed to purchase, all of the "Purchased Assets" of Zomac, (b) Zomac and its owners agreed to a five-year covenant not to compete, (c) Full Boar agreed to pay $910,000 to Zomac ($810,000 at closing plus the execution of a $100,000 four-year note), subject to certain post-closing adjustments, and (d) Full Boar agreed to be responsible for the payment of all outstanding Accounts Payable (as defined in the APA) as of the closing.[27]  Separately, Full Boar (as tenant) and Zomac Properties, LLC (as landlord), an affiliate of Zomac, agreed to enter into a lease pursuant to which Full Boar would lease the Sylvania Property for an initial term of ten years.[28]

---

[22] *See* Plaintiff's Exh. 2, at pp.BROWN-MEB-000028 to -000038 (Full Boar LLC Agreement).

[23] *See id.*, at p.BROWN-MEB-000038; *see also* Brown Deposition, at pp.66:25-67:12.

[24] *See* Full Boar LLC Agreement § 4.1.

[25] *See* Plaintiff's Exh. 2, at pp.BROWN-MEB-000019 to -000021 (President's Certification and Consent for Full Boar, evidencing Brown's 100% membership interest in Full Boar); *see also* Complaint ¶ 9; Answer ¶ 9.

[26] *See* Plaintiff's Exh. 3 (APA).

[27] *See* APA §§ 1-2 and 5-6.

[28] *See id.*, at p.1 (Recital B).

Under the terms of the APA, the "Purchased Assets" of Zomac were defined as "all of the assets, rights, and interests of every conceivable kind or character, whatsoever, whether tangible or intangible, that on the Closing Date (as defined in this Agreement)[29] are owned by [Zomac] or in which [Zomac] has an interest of any kind relating to the Business,"[30] including, without limitation, Zomac's trademarks, telephone numbers, and other intellectual property, Contracts (as defined in the APA), and Goodwill (as defined in the APA).[31] "Goodwill" is defined as including the Zomac name and the right to use the Zomac name, Zomac's telephone numbers, and Zomac's business internet address.[32] Notwithstanding the expansiveness of the APA, the one thing that the transaction did not provide for is the sale of the stock of Zomac to either Full Boar or Brown. The sale was structured solely as an asset sale. Thus, following the closing of the transaction, Zomac remained a separate entity owned by its existing shareholders.

To finance the acquisition under the APA and provide additional working capital for Full Boar, Brown successfully arranged for Full Boar to obtain an $880,000 loan from Byline Bank backed by the Small Business Administration (the "**SBA Loan**").[33] Brown was required to provide a personal guaranty to obtain the SBA Loan, which he did.[34] Thus, with the financing in hand, on or about November 29, 2019, the transaction closed. Having acquired, among other things, Zomac's name, signage, telephone numbers, business internet address, contract rights, and a fleet

---

[29] "Closing Date" is defined in the APA as a date on or before November 29, 2019, or such later date as may be agreed upon by the parties. *See id.* § 34.

[30] "Business" is defined in the APA as the "electrical service business, and the assets used in connection with such business" owned and operated by Zomac "under the name of Zomac Electrical Systems" and located at the Sylvania Property. *See id.*, at p.1 (Recital A).

[31] *See id.* § 1.

[32] *See id.* §§ 1.B., 1.F and 1.H.

[33] *See* Plaintiff's Exh. 2 (Loan Agreement with respect to SBA Loan).

[34] *See* Complaint ¶ 16; Answer ¶ 16.

of vehicles, and having also successfully transitioned roughly fifteen (15) employees of Zomac over to Full Boar[35] and obtained a long-term lease of the Sylvania Property from Zomac Properties, Full Boar immediately began to operate under the name of Zomac Electrical Systems or sometimes just Zomac Electric.[36]

In relation to the Zomac CSA, the APA provided for all contract rights to be assigned to Full Boar and for Full Boar to assume, pay, and perform all contractual liabilities that arise after the closing.[37] Peoplelink itself, however, was not a party to the APA and had no separate agreement with Full Boar or Brown. While it appears that Farrell/Peoplelink was provided with Brown's name as the new business contact for *Zomac* following the closing, Peoplelink was not informed of the transaction with Full Boar and it was not until years later that it became aware of the fact that Full Boar, a separate entity, was operating under the Zomac name.

### D.    *Full Boar Experiences Financial Trouble*

While Full Boar was able to keep up with its bills for the first couple of months, by as early as the beginning of 2020, within months of the closing, Brown knew that Full Boar was facing the "glaring problem" of not being able to keep up with its contractual obligations.[38] Indeed, within months of the closing, both Full Boar and Brown were insolvent.[39] Things only worsened in mid-March 2020 when the World Health Organization declared the COVID-19 outbreak to constitute a global pandemic, thereby causing a spike in the cost of construction materials and complications in scheduling and staffing projects.

---

[35] *See* Complaint ¶ 15; Answer ¶ 15.

[36] *See* Complaint ¶ 19; Answer ¶ 19.

[37] *See* APA §§ 1 and 4.A.

[38] *See* Brown Deposition, at pp.138:12-139:10.

[39] *See* Complaint ¶ 21; Answer ¶ 21; *see also* Plaintiff's Exh. 4, at pp.2-3 (Full Boar balance sheet as of 12/31/2019, reflecting balance sheet insolvency).

Ultimately, Full Boar sought and obtained additional financing in the form of a $300,000 Paycheck Protection Program (PPP) loan and a $350,000 COVID-19 Economic Injury Disaster Loan (EIDL).[40]  While the PPP loan was ultimately forgiven, the EIDL loan obligation remained. In 2020, Full Boar experienced a net loss of between $27,727.54 and $84,245.00.[41]

### E.      Brown Obtains Temporary Labor from Peoplelink for Full Boar

In early 2021, in the midst of Full Boar's financial troubles, Peoplelink caused the *Zomac* account to be internally transferred from Farrell to Ashlee Scott ("**Scott**"), one of Peoplelink's other account managers.  As with any account transfer, Scott planned to reach out to *Zomac* to introduce herself and ensure that *Zomac's* needs were being adequately addressed.  Based upon Brown's listing within the Peoplelink customer database as the business contact for *Zomac*, Scott placed a call to Brown at the telephone number listed for *Zomac*.  Brown answered the call.  During the call, Scott informed Brown that she was the new Peoplelink account manager for *Zomac*, and Scott and Brown scheduled an in-person meeting to discuss *Zomac's* labor needs.

On or about March 8, 2021, Scott met with Brown at the Sylvania Property, which was listed as *Zomac's* place of business in Peoplelink's customer database.  During the meeting, Brown introduced himself as the owner of *Zomac* and the two discussed the electrical labor support that Peoplelink could provide for *Zomac's* projects.[42]  Brown told Scott that her visit was "perfect

---

[40] *See* Brown Deposition, at pp.71:23-72:13, 72:18-20.

[41] *See* Plaintiff's Exh. 5 (calendar year 2020 profit-loss statement for Full Boar's Zomac Electrical Systems business, reflecting net loss of $28,000); Plaintiff's Exh. 6 (Schedule C to Brown's 2020 Form 1040 federal income tax return, reflecting net loss associated with Full Boar of $84,245).

[42] *See* Complaint ¶ 26; Answer ¶ 26.

timing" because he had a need for electrical contractors.[43]  At the time, Full Boar had five different projects in five different north Texas cities for which it was serving as an electrical subcontractor.[44]

Scott was wholly unaware of the separate existence of Full Boar and of Full Boar's connection to the Zomac business.  Brown never clarified that he was not the actual owner of *Zomac* (the entity) or that Full Boar had acquired Zomac's assets and business.[45]  By the time of the meeting, however, Full Boar had been operating under the Zomac name for over a year and, being accustomed to receiving a variety of temp agency "cold calls," Brown assumed that the outreach from Peoplelink was simply an unsolicited "cold call" visit from a temp agency in relation to the "Zomac" business that Full Boar was operating.

Even so, Scott testified that had she known that she was dealing with an entirely new entity (*i.e.*, Full Boar instead of Zomac), then in accordance with Peoplelink policy, she would have required a new Client Services Agreement with Full Boar after Full Boar had successfully completed a credit review and supplied one or more personal guarantees, if required.  Believing instead that she was dealing with Zomac under the existing Zomac CSA, Scott proceeded to work through the labor needs described by Brown, and Peoplelink thereafter supplied temporary labor to Brown for Full Boar projects without an independent Customer Services Agreement in place with either Full Boar or Brown or a personal guaranty from Brown.

---

[43] *See* Complaint ¶ 26; Answer ¶ 26.

[44] *See* Complaint ¶ 23; Answer ¶ 23.

[45] *See* Complaint ¶ 26; Answer ¶ 26.

### F.    *The Full Boar Business Collapses*

Throughout 2021, Full Boar's financial condition continued to worsen.  For calendar year 2021, Full Boar experienced a net loss of between roughly $300,000 and $410,000.[46]  In relation to Peoplelink, by the end of 2021 invoices were going unpaid.[47]  Facing continuing cashflow shortages, in an effort to buy additional time for a rebound, Brown even resorted to having Full Boar take out a high interest merchant cash advance secured by all of Full Boar's accounts receivable and a personal guarantee from Brown.[48]

In early 2022, Scott and a member of Peoplelink's management team met with Brown to address the unpaid balance owed by *Zomac*.  At no point during the conversation did Brown tell Peoplelink to stop furnishing labor because of an inability to pay.  Instead, Brown attempted to deflect the inquiry by claiming that certain of the amounts billed were inaccurate and being reconciled prior to payment.  Thereafter, as Full Boar's debts continued to pile up, Brown prioritized the payment of older obligations first, leaving Peoplelink's more recent invoices unpaid.

Ultimately, matters never turned around for Full Boar and Brown concluded that Full Boar was not going to survive.[49]  On May 27, 2022, Brown caused Full Boar to cease all operations.  By that point, the financial hole with Peoplelink had grown to an amount in excess of $184,000.[50]

---

[46] *See* Plaintiff's Exh. 7 (calendar year 2021 profit-loss statement for Full Boar's Zomac Electrical Systems business, reflecting net loss of $291,645.98); Plaintiff's Exh. 10, at ECF p.13 (Schedule C to Brown's 2021 Form 1040 federal income tax return, reflecting net loss associated with Full Boar of $409,741).

[47] *See* Plaintiff's Exh. 26 (Peoplelink account reconciliation for Zomac Electrical Systems).

[48] *See* Complaint ¶ 22; Answer ¶ 22.

[49] *See* Plaintiff's Exh. 11 (1/1/2022-5/30/2022 profit-loss statement for Full Boar's Zomac Electrical Systems business, reflecting net loss of $18,390.38).

[50] *See* Plaintiff's Exh. 26 (Peoplelink account reconciliation for Zomac Electrical Systems, reflecting principal unpaid balance of $184,206.32 for amounts billed through 4/10/2022).

*G.*     ***Brown Engages Bankruptcy Counsel and Develops an Asset Protection Plan***

Facing personal liability on account of, among other things, the multiple guarantees that he had executed, Brown determined to consult with a personal bankruptcy attorney in early 2022. Brown reached out to Alice Bower ("**Bower**") of the Law Office of Alice Bower for such purpose. Based upon his initial consultation with Bower, on or about May 19, 2022, Brown entered into an engagement agreement with Bower for Bower to handle the filing of a chapter 7 bankruptcy case for him.[51]

Given the collapse of Full Boar and the impact to Brown's income, the Browns also began to consider a sale of their Frisco Property.  Brown wanted to get the house sold while the housing market was hot.  He also, however, wanted to find a way to shelter the sales proceeds from creditors because, by May 2022, Brown was facing not only guaranty liability with respect to the Full Boar loans, but also in excess of $480,000 in claims for contractor-related debts without taking into account the greater than $184,000 owed to Peoplelink.[52]

On May 31, 2022, Brown sent an email to Bower to ask whether the net sales proceeds from the house sale could be used for another property or deposited into a self-directed IRA for later use in purchasing real estate as part of a 1031 exchange.[53]  On the same day, Bower responded, properly advising Brown that the sales proceeds would retain their exempt status only if and to the

---

[51] *See* Plaintiff's Exh. 9 (engagement agreement between Brown and Bower).

[52] *See* Bankruptcy Case Docket No. 1, at ECF pp.32-46 (Schedule E/F of Brown's sworn bankruptcy schedules, reflecting undisputed, liquidated, noncontingent unsecured debts totaling $480,314.25 owed by Brown to Associated Cutting, Inc., C.E.D., Caroline's Construction Solutions, LLC, City Electric Supply, Crawford Electric Supply, Elliott Electric Supply, Empire Disposal Ltd., Graybar Electric Company, Inc., Lonestar Electric Supply, NuPower Systems & Services, Palfinger USA, LLC, Parrish-Hare Electric Supply, Proman Skilled Trades, Rental One, Select Building Systems, Inc., Summit Electric Supply Co., Inc., Sunstate Equipment Company, Talent Corporation LLC, and Texas First Rental).

[53] *See* Plaintiff's Exh. 12, at p.BROWN_000017.

extent used to purchase a new homestead within 180 days of the closing of the Frisco Property.[54]

Thereafter, on June 29, 2022, Brown sent a follow-up text to Bower to advise her that he and his wife had entered into an agreement to sell the Frisco Property, with a closing planned to take place by July 25, 2022. He asked Bower for her "IRA source."[55] Bower responded the same day with her contact at Cotton Wealth Management, Steve Cotton ("**Cotton**"), who could assist the Browns in setting up an individual retirement account (IRA).[56]

After meeting with Cotton, the strategy shifted. The Browns decided, instead, to use the home sale proceeds to acquire an annuity, which they believed to be another form of exempt asset that effectively put the proceeds outside of the reach of creditors. At that point, the only issue was to figure out where to protectively park the proceeds between the time of the house closing and acquisition of the annuity. While the Browns originally planned to open a separate bank account to temporarily hold the proceeds, their account opening requests were denied by the bank that they approached. Being concerned about using their existing bank account,[57] on July 22, 2022, Brown asked Bower if the proceeds could be temporarily held in her IOLTA trust account. Bower agreed and provided her IOLTA account information to Brown.[58]

---

[54] *See id.*, at p.BROWN_000016.

[55] *See* Plaintiff's Exh. 13.

[56] *See id.*

[57] *See* Brown Deposition, at pp.155:15-156:6; *see also* Plaintiff Exh. 15, at p.1 (8/3/2022 correspondence referring to pending litigation against Full Boar and Brown).

[58] *See* Plaintiff's Exh. 14, at pp.3-4.

**H.** *The Frisco Property is Sold and the Net Proceeds are Used to Acquire the Annuity*

On or about July 25, 2022, the Frisco Property sold for $650,081.90. After payoff of the home mortgage and closing costs, the Browns netted $377,376.41 in sale proceeds (the "**Net Proceeds**").[59] The Net Proceeds were temporarily parked in Bower's IOLTA trust account.

In August 2022, creditor activity intensified.[60] On August 9, 2022, for example, Select Building Systems, Inc., the general contractor of a project on which Full Boar worked, filed suit against Full Boar and Brown in Parker County, Texas, after its demand letter had gone unanswered.[61] At that point, the Browns continued to have no plan to reinvest the Net Proceeds in a new homestead. They remained steadfast in their plan to safeguard the Net Proceeds from creditor collection efforts by purchasing an annuity. Indeed, on the same date on which Select Building Systems filed suit against Brown, Brown reported to Bower that the annuity would be obtained by the end of the week.[62]

Ultimately, with the assistance of Cotton, the Browns used $377,376 of the Net Proceeds to purchase an annuity contract from The Lincoln National Life Insurance Company ("**Lincoln**").[63] Lincoln thereafter issued to the Browns, as co-owners, a Lincoln Level Advantage® B-Share Indexed Variable Annuity contract, effective as of August 26, 2022, having a maturity of April 5, 2068 (the "**Annuity**").[64]

---

[59] *See* Complaint ¶ 50; Answer ¶ 50.

[60] *See* Plaintiff's Exh. 15, at p.1 (8/3/2022 correspondence referring to pending litigation against Full Boar and Brown) and pp.2-3 (8/9/2022 correspondence referring to creditor demand letter alleging fraudulent conduct on the part of Full Boar and Brown).

[61] *See* Complaint ¶ 51; Answer ¶ 51.

[62] *See* Plaintiff's Exh. 15, at p.1 (8/9/2022 correspondence).

[63] *See* Brown Deposition, at p.153:12-20.

[64] *See* Plaintiff's Exh. 16 (Annuity); *see also id.*, at ECF p.29 (contract specifications page).

### I.        *Brown Files the Bankruptcy Case*

With the Annuity purchase taken care of, Brown then coordinated with Bower on finalizing the required paperwork for his bankruptcy filing.  On October 4, 2022 (the "**Petition Date**"), Brown filed his voluntary petition for relief under chapter 7 of the Bankruptcy Code, thereby initiating the Bankruptcy Case.[65]  Along with the petition, Brown filed his sworn schedules of assets and liabilities.[66]  In Schedule E/F, Brown identified Peoplelink (under its dba name Trade Management) as holding an undisputed, liquidated, non-contingent claim against him in the amount of $192,617.11.[67]  Brown also scheduled in excess of $480,000 of other undisputed, liquidated, noncontingent contractor-related debts that had been incurred prior to the Frisco Property sale and purchase of the Annuity.[68]

On February 28, 2023, Peoplelink filed its proof of claim in the Bankruptcy Case to assert a nonpriority, unsecured claim against Brown's bankruptcy estate in the same amount of the debt scheduled by Brown – $192,617.11 (the "**Peoplelink Claim**").[69]  Despite Brown's identification of the Peoplelink Claim as a valid debt within his sworn schedules, on April 1, 2023, after Peoplelink had filed suit against Brown in this adversary proceeding, Brown filed an objection to the allowance of the Peoplelink Claim, asserting that the claim should be disallowed on the basis of insufficient documentation.[70]  On July 10, 2023, having found that Peoplelink included

---

[65] *See* Bankruptcy Case Docket No. 1.

[66] *See id.*, at ECF pp.9-61.

[67] *See id.*, at ECF p.42 (Schedule E/F item 4.29).

[68] *See id.*, at ECF pp.32-46 (Schedule E/F, reflecting undisputed, liquidated, noncontingent unsecured debts totaling $480,314.25 owed by Brown to Associated Cutting, Inc., C.E.D., Caroline's Construction Solutions, LLC, City Electric Supply, Crawford Electric Supply, Elliott Electric Supply, Empire Disposal Ltd., Graybar Electric Company, Inc., Lonestar Electric Supply, NuPower Systems & Services, Palfinger USA, LLC, Parrish-Hare Electric Supply, Proman Skilled Trades, Rental One, Select Building Systems, Inc., Summit Electric Supply Co., Inc., Sunstate Equipment Company, Talent Corporation LLC, and Texas First Rental).

[69] *See* Bankruptcy Case Claim No. 1.

[70] *See* Bankruptcy Case Docket No. 39.

sufficient documentation with the proof of claim and that Brown, himself, had sworn to the validity of the claim in his schedules, the Court entered an order overruling the objection.[71]

## DISCUSSION

### A.    Section 727 Objection to Discharge

The federal bankruptcy system is designed to provide the honest but unfortunate debtor with the opportunity to obtain a fresh financial start.[72]  As framed by the Supreme Court, "a central purpose of the [Bankruptcy] Code is to provide a procedure by which certain insolvent debtors can reorder their affairs, make peace with their creditors, and enjoy 'a new opportunity in life with a clear field for future effort, unhampered by the pressure and discouragement of preexisting debt.'"[73]  The fresh financial start contemplated by the Bankruptcy Code is effectuated through a discharge of indebtedness.  In chapter 7, the discharge is provided by section 727 of the Bankruptcy Code.[74]

Importantly, the bankruptcy system is designed for honest debtors – those who, among other things, have not engaged in fraudulent conduct leading up to the bankruptcy filing.  For those who have failed to act in such manner, the Bankruptcy Code sets out a number of grounds in section 727 of the Bankruptcy Code for the denial of a discharge.[75]

In this case, Peoplelink has objected to Brown's discharge pursuant to section 727(a)(2)(A) of the Bankruptcy Code.  In relevant part, section 727(a)(2)(A) provides for the denial of a discharge to a chapter 7 debtor if "the debtor, with intent to hinder … a creditor … has transferred

---

[71] *See* Bankruptcy Case Docket No. 49.

[72] *Marrama v. Citizens Bank of Massachusetts*, 549 U.S. 365, 367 (2007).

[73] *Grogan v. Garner*, 498 U.S. 279, 286 (1991) (quoting *Local Loan Co. v. Hunt*, 292 U.S. 234, 244 (1934)).

[74] *See* 11 U.S.C. § 727(a); *see also id.* at § 524(a) (provision giving effect to discharge).

[75] *See* 11 U.S.C. § 727(a)(2)-(a)(7) (grounds for the denial of a discharge in chapter 7).

… property of the debtor, within one year before the date of the filing of the petition."[76]  Thus, to successfully secure the denial of Brown's discharge pursuant to § 727(a)(2)(A), Peoplelink must establish the following four elements: (1) a transfer of property; (2) belonging to Brown; (3) within one year of the Petition Date; and (4) with intent to hinder a creditor.[77]

Here, Peoplelink asserts that, within one year of the Petition Date, Brown transferred his interest in the Net Proceeds to Lincoln to purchase the Annuity with the intent to hinder his creditors, including Peoplelink.  In response, Brown first disputes the existence of any "transfer" at all.  But even if there was a transfer, while Brown concedes that he had the intent of shielding the Net Proceeds from creditor collection activity, he disputes that such motive is sufficient to satisfy the final element of § 727(a)(2)(A) because he allegedly intended to do nothing more than convert one form of exempt property into another form of exempt property and he allegedly relied upon the advice of counsel in taking such action.

### 1.   *Transfer of Property Belonging to the Debtor*

First, Brown claims that the acquisition of the Annuity did not constitute a "transfer" because the Browns continued to maintain dominion and control over the invested Net Proceeds in the form of the Annuity.  In making this argument, Brown appears to rely upon a variety of Texas state court cases that have had to tackle the difficult question of whether, under the Texas Uniform Fraudulent Transfer Act ("**TUFTA**"), an annuity-issuing financial institution or insurance company constitutes a "transferee" of funds fraudulently transferred to the entity to purchase the annuity.  The "transferee" question, however, is an entirely different question than whether a "transfer" has occurred.  The transferee issue goes to the remedial question of from whom a

---

[76] *See* 11 U.S.C. § 727(a)(2)(A).

[77] *Cadle Co. v. Pratt (In re Pratt)*, 411 F.3d 561, 565 (5th Cir. 2005) (quoting *Pavy v. Chastant (In re Chastant)*, 873 F.2d 89, 90 (5th Cir. 1989)); *Robertson v. Dennis (In re Dennis)*, 330 F.3d 696, 701 (5th Cir. 2003).

wronged creditor may recover in the face of a fraudulent transfer.  None of the Texas courts that have addressed the transferee question have appeared to have a problem determining that the use of funds to purchase an annuity constitutes a "transfer" under TUFTA.[78]

In relation to § 727(a)(2)(A), the Bankruptcy Code itself supplies the definition of "transfer."  It defines a "transfer" as including, among other things, "each mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with – (i) property; or (ii) an interest in property."[79]  Thus, given the expansiveness of the definition, there can be little question that the use of the Net Proceeds to purchase the Annuity constituted a mode of parting with an interest in property – *i.e.*, a "transfer."[80]  And the fact that the Browns have maintained a level of dominion and control over the Annuity by naming themselves as the beneficiaries and retaining the contractual right to terminate or liquidate the Annuity early, subject to certain charges and penalties,[81] does not change the fact that Brown parted with his interest in the Net Proceeds in order to purchase the contractual rights of the Annuity.[82]

---

[78] *See, e.g., Hearne v. Riversource Life Ins. Co.*, 670 S.W.3d 360, 370 (Tex. App.-Texarkana 2023, pet. denied) ("While we recognize that TUFTA's definition of a transfer is broad, we also note that that broad definition is designed to promote TUFTA's purpose of 'prevent[ing] debtors from prejudicing creditors by improperly moving assets beyond their reach.'  The broad definition of transfer accomplishes that purpose by subjecting almost any form of conveyance a debtor attempts to make to the remedies provided by TUFTA.  Thus, the definition of transfer focuses on the debtor and its attempt to move its assets beyond the reach of creditors.  In contrast, the dominion or control test, at least in relation to financial institutions, financial services companies, and insurance companies offering financial or investment services that hold or invest funds on behalf of their clients, focuses on the realities of the relationship between the debtor, the funds, and the holder of those funds.") (citation omitted).

[79] 11 U.S.C. § 101(54)(D).

[80] Importantly, transfer of the Net Proceeds to Lincoln was more than a mere deposit of funds into a bank account or safe deposit box.  The Browns made the transfer in order to "purchase" the Annuity contract, an agreement under which Lincoln bound itself to specific contractual obligations.  *See* Annuity, at ECF p.7 ("Dear MICHAEL BROWN and STEPHANIE BROWN: With your *purchase* of a Lincoln annuity, you've taken a big step toward ensuring your retirement will be lived on your terms.") (emphasis added).

[81] *See* Complaint ¶ 55; Answer ¶ 55.

[82] *See Bossart v. Havis (In re Bossart)*, 296 Fed. Appx. 398 (5th Cir. 2008) (upholding fraudulent transfer judgment against debtors who purchased an annuity on the eve for their bankruptcy filing); *cf. Levine v. Weissing*, 134 F.3d 1046, 1049-50 (11th Cir. 1998) (finding the purchase of an annuity to constitute a "transfer" under Florida law); *Soza v. Hill (In re Soza)*, 542 F.3d 1060 (5th Cir. 2008) (discussing fraudulent nature of prepetition transfer of funds to purchase annuity in the context of the Texas Insurance Code).

Thus, the Court finds that Peoplelink has met its burden of establishing that, for purposes of Bankruptcy Code § 727(a)(2)(A), the transfer by Brown of his interest in the Net Proceeds to Lincoln to purchase the Annuity constituted a transfer of property belonging to Brown within one year of the Petition Date, thereby satisfying the first three elements of the § 727(a)(2)(A) claim.

### 2.   *Intent to Hinder Creditors*

To satisfy the last element of a § 727(a)(2)(A) claim (intent to hinder a creditor), the level of intent that must be shown is actual intent, as opposed to constructive intent.[83]   Pursuant to his Answer to the Complaint, Brown admits that he used the Net Proceeds to purchase the Annuity with the actual intent to hinder his creditors.[84]   At trial, however, he attempted to walk back the admission, claiming that the level of intent required by § 727(a)(2)(A) cannot be established under the facts of this case and based upon his reliance on counsel.

In the former case, Brown argues that no creditor was allegedly hindered because all that Brown did was convert one form of exempt property (the Net Proceeds) into another form of exempt property (the Annuity); thus, per Brown, there can be no intent to hinder where no creditor is, in fact, hindered.   While creative, such argument is predicated upon a faulty assumption – namely, that as of the time of the purchase of the Annuity, the Net Proceeds constituted exempt property.

Pursuant to section 41.001(a) of the Texas Property Code, a homestead is "exempt from seizure for the claims of creditors except for encumbrances properly fixed on homestead property."[85]   To preserve the homestead protection for one who decides to sell his existing

---

[83] *Pratt*, 411 F.3d at 565 (citing *Chastant*, 873 F.2d at 91); *see also Cadle Co. v. Duncan (In re Duncan)*, 562 F.3d 688, 698 (5th Cir. 2009).

[84] *See, e.g.*, Complaint ¶¶ 58-60; Answer ¶¶ 58-60.

[85] Tex. Prop. Code § 41.001(a).

homestead and transition to a new homestead, section 41.001(c) of the Texas Property Code provides that the "homestead claimant's proceeds of a sale of a homestead are not subject to seizure for a creditor's claim for six months after the date of sale."[86] This provides sufficient time for the homestead claimant to use the proceeds of the old homestead to purchase a new homestead without facing the risk of seizure of the proceeds by creditors during the transition.[87]

Importantly, however, "[t]he object of the proceeds exemption statute was *solely* to allow the claimant to invest the proceeds in another homestead, *not to protect the proceeds, in and of themselves*."[88] Thus, for example, after the purchase of a new homestead, the proceeds exemption is immediately deactivated with respect to all remaining proceeds, even if prior to expiration of the six-month period, because the object of the statutory protection is the homestead, not the proceeds.[89] In other words, whereas one's interest in a homestead under Texas law is unconditionally exempt, one's interest in the proceeds from sale of the homestead is conditionally exempt, dependent upon both time (six-month limit) and use.[90] In relation to use, just as real property loses its homestead character and protection as exempt property where it is shown that there has been a cessation of the use of the property as homestead, coupled with the intent to permanently abandon the homestead with no intention to return and claim the homestead exemption,[91] the proceeds of sale of a homestead lose their conditional exempt status where (or to

---

[86] *Id*. § 41.001(c).

[87] Prior to the enactment of § 41.001(c), those who voluntarily sold or exchanged their homestead property were at risk being rendered homeless if their creditors successfully seized the sales proceeds prior to purchase of the new homestead property. *See England v. FDIC (In re England)*, 975 F.2d 1168, 1174-75 (5th Cir. 1992).

[88] *Zibman v. Tow (In re Zibman)*, 268 F.3d 298, 305 (5th Cir. 2001) (emphasis in orig.) (quoting *England*, 975 F.2d at 1174-75).

[89] *See England*, 975 F.2d at 1174.

[90] *See Hawk v. Engelhart (In re Hawk)*, 871 F.3d 287, 292-96 (5th Cir. 2017).

[91] *See Kendall Builders, Inc. v. Chesson*, 149 S.W.3d 796, 808 (Tex. App. – Austin 2004, pet. denied) (discussing abandonment concepts); *Estate of Montague v. National Loan Invs., L.P.*, 70 S.W.3d 242, 248 (Tex. App. – San Antonio 2001, pet. denied) (same).

the extent that) it is shown that the homestead seller has no intention to use the proceeds to purchase new real property that will be claimed as exempt homestead property.[92]

Here, Peoplelink successfully established that Brown had no intent to use any of the Net Proceeds to purchase new real property that would be claimed as exempt homestead property. As admitted by Brown, "in June of 2022, well aware of the insolvency of Full Boar and his personal liability for its debts to Peoplelink, Brown began to look for ways to protect the financial future of his family and shield as many assets as possible from his creditors, including Peoplelink."[93] Ultimately, he and his wife developed a strategy with the assistance of Cotton to use the Net Proceeds to purchase the Annuity. Thus, by no later than the time that the Browns initiated the transfer of the Net Proceeds to Lincoln (or to Cotton for delivery to Lincoln), the Browns had abandoned the conditional exemption applicable to the Net Proceeds, causing the Net Proceeds to constitute non-exempt property as of the time of purchase of the Annuity.[94]

Secondarily, Brown attempts to justify his actions on the purported advice of legal counsel. A defense predicated upon the reliance on counsel is justified only where a debtor shows that the reliance was both reasonable and in good faith.[95] Here, Brown has failed to establish either. First, in relation to reasonable reliance, it is necessary to consider whether there was any reliance at all, given the advice that was actually provided by Bower. In this regard, when asked about protecting the home sale proceeds, Bower advised Brown that the proceeds would only be protected from creditors if and to the extent invested in a new homestead within six months of the sale. No

---

[92] *See, e.g., Greenstein v. Parker*, No. 05-05-01664 -CV, 2007 WL 1652061, at *2-*3 (Tex. App. – Dallas June 8, 2007, no pet.) (upholding determination of abandonment of exempt status of homestead sale proceeds).

[93] *See* Complaint ¶ 49; Answer ¶ 49.

[94] *See also* Complaint ¶ 58; Answer ¶ 58.

[95] *See Tow v. Henley (In re Henley)*, 480 B.R. 708, 791 (Bankr. S.D. Tex. 2012); *Morton v. Dreyer (In re Dreyer)*, 127 B.R. 587, 597 (Bankr. N.D. Tex. 1991).

evidence was presented of Bower ever changing her position with respect to such advice. Thereafter, in disregard of such advice, the Browns developed the annuity strategy in consultation with Cotton. That said, to the extent that any supplemental legal advice was provided after developing the annuity strategy, having already obtained Bower's cautionary advice with respect to the limited protection afforded to homestead sale proceeds, it was unreasonable for Brown to thereafter conclude that the use of the Net Proceeds for anything other than reinvestment in a new homestead property would be immunized.

Moreover, irrespective of what advice was given by Bower, the evidence presented at trial established that any reliance thereon was not in good faith. Even before obtaining advice from Bower, Brown was unequivocally looking for ways to prevent creditors, including Peoplelink, from being able to seize any portion of the Net Proceeds. And he remained steadfast in that objective in the face of the initial advice that Bower gave. In other words, Brown never wavered from his knowing, voluntary, and purposeful mission to use the Net Proceeds to purchase an investment product (ultimately, the Annuity) that he believed could never be attached by his creditors. Any after-the-fact gratuitous advice that he may have obtained from Bower to the effect that, notwithstanding his actual intent to hinder creditors, his conduct is forgivable based upon the (mistaken) believe that Brown was merely swapping one exempt asset for another exempt asset does not negate the intent that Brown had to hinder creditor collection efforts.

Thus, taking into account all of the foregoing, the Court finds that Peoplelink has met its burden of establishing, for purposes of Bankruptcy Code § 727(a)(2)(A), that the transfer by Brown of his interest in the Net Proceeds to Lincoln to purchase the Annuity was made with the actual intent to hinder his creditors, thereby satisfying the fourth and final element of the §

727(a)(2)(A) claim. Therefore, Peoplelink's objection to the grant of a discharge will be sustained and Brown will be denied a chapter 7 discharge.

**B.     *Section 523 Nondischargeability Claim***

Based upon the above determination that Brown's discharge will be denied under § 727 of the Bankruptcy Code, it is unnecessary to determine Peoplelink's claim of nondischargeability under § 523 of the Bankruptcy Code. Such claim is rendered moot.[96]

### *CONCLUSION*

For all the foregoing reasons, Peoplelink's objection to discharge under 11 U.S.C. § 727(a)(2)(A) will be sustained and Brown shall be denied a discharge in the Bankruptcy Case. Peoplelink's nondischargeability claim under 11 U.S.C. § 523 will be denied without prejudice as moot. The Court will separately enter a final judgment in conformity herewith.

# # #   END OF MEMORANDUM OPINION   # # #

---

[96] With respect to Peoplelink's request for attorneys' fees, the Court notes that the request was only made in the prayer for relief of the Complaint and not as a separate cause of action. While the determination of attorneys' may have been necessary to a determination of the amount of the debt owed by Brown to Peoplelink that is nondischargeable under § 523 of the Bankruptcy Code, because a nondischargeability determination is unnecessary on account of the denial of a discharge to Brown pursuant to § 727, it is also unnecessary for the Court to determine whether and to what extent the debt owed to Peoplelink by Brown includes allowable attorneys' fees. Therefore, no such determination is made herein.